United States District Court
Eastern District of Michigan
Southern Division

United States of America,

 Plaintiff,

        No. 22-cr-20272

v.

        Hon. Bernard A. Friedman

D-1 Apollon Nimo,
D-2 Farrah Bahoo,

 Defendants.

---

**Response of the United States in
Opposition to Defendant Nimo's Motion
to Suppress Search of Mobile Phone
(ECF No. 40)**

---

Defendant Apollon Nimo seeks to suppress all evidence obtained from a search, pursuant to warrant, of the mobile phone he, co-defendant Farrah Bahoo, and their co-workers used to conduct their car sales business—the "Target Telephone."[1] Nimo's motion is predicated on two omissions from the application for the search warrant. But Nimo has not shown those omissions were material or made with the intent to mislead, and the warrant was supported by sufficient probable cause in any event. What is material are the omissions from Nimo's motion: (1) any showing that Nimo had a reasonable expectation of privacy in the phone, (2) significant facts supporting the magistrate's finding of probable cause, (3) and binding authority. Nimo's motion should be denied.

## Background

The essential allegation in this case is that defendants Apollon Nimo and Farrah Bahoo, who worked in sales at Parkway Dodge Chrysler Jeep Ram in Clinton Township, Michigan, committed wire

---

[1] The Target Telephone is an Apple iPhone 12 Pro Max with assigned call number (586) 665-0652. Defendant Bahoo has not sought to suppress the evidence or joined in Nimo's motion. The deadline to file pretrial motions was September 16, 2022.

fraud and conspiracy to commit wire fraud by fraudulently using Fiat
Chrysler Automobiles (FCA) employee discounts in their sales for
customers who were not eligible to receive them.

Based on information from FCA, Facebook, phone records, an
undercover encounter with Nimo, and interviews with known witnesses,
Homeland Security Investigations Special Agent Joseph Kunnummyalil
applied for a warrant to search the Target Telephone for evidence of
wire fraud and conspiracy to commit wire fraud. Magistrate Judge
Anthony Patti reviewed the application, found that it established
probable cause, and authorized the warrant on April 28, 2021. (Def't
Exhibit 1–filed under seal). He also authorized a criminal complaint
and warrant to arrest Nimo. (ECF No. 1, PageID.1).

**Argument**

## I.     Nimo has failed to show that he had a reasonable expectation of privacy in the Target Telephone.

As a threshold matter, Nimo's motion should be denied because he
has not shown that he had a reasonable expectation of privacy in the
Target Telephone—a mobile phone paid for by his employer, for
business use, that Nimo used in common with other Parkway
employees, and that was subject to Parkway policies that allowed

Parkway to examine and disclose its contents.

Nimo bears the burden of establishing that his Fourth Amendment rights were violated by the search of the Target Telephone. *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1 (1978); *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011). That means that Nimo must show that he had a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). To do that, Nimo must show that he had: (1) a subjective expectation of privacy; and (2) an objectively reasonable expectation of privacy in the Target Telephone. *See id.* He has not made that showing.

Whether Nimo had a legitimate expectation of privacy depends not on whether he had some property right in the Target Telephone, but on whether he had a legitimate expectation of privacy in its contents. *Rakas*, 439 U.S. at 143. In general, allowing common use of property can mean that there is no reasonable expectation of privacy in that space. *United States v. Risse*, 83 F.3d 212, 216 n.3 (8th Cir. 1996). And an employee's expectation of privacy in workspaces and devices depends on the employee's relationship to the item seized and several other

factors, including whether: (1) the employer maintained a policy on use, (2) the employer had a policy allowing monitoring and access, (3) the employer notified employees of the policy, (4) third parties had a right of use or access, and (5) the employee took action to maintain his privacy. *See O'Connor v. Ortega*, 480 U.S. 709, 718–19 (1987); *United States v. Angevine*, 281 F.3d 1130, 1134 (10th Cir. 2002); *Muick v. Glenayre Elec.,* 280 F.3d 741, 743 (7th Cir.2002); *United States v. Simons,* 206 F.3d 392, 398 & n. 8 (4th Cir.2000); *Gossmeyer v. McDonald*, 128 F.3d 481, 490 (7th Cir. 1997); *American Postal Workers Union v. United States Postal Serv.,* 871 F.2d 556, 560–61 (6th Cir.1989); *In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 257–58 (Bankr. S.D.N.Y. 2005) (citing cases).

During the course of his employment, Parkway reimbursed Nimo for at least three mobile phones used for business purposes: an iPhone 7 in 2016; an iPhone X in 2018; and the Target Telephone, an iPhone 12 Pro Max, in December 2020. (Gov't Ex. A). Parkway also reimbursed Nimo for the purchase of two Apple iPad Pro tablets to use for business purposes, in March and December 2020. (*Id.*)[2]

---

[2] Two iPad Pro tablets were voluntarily turned over to Agent Kunnummyalil by Parkway on May 17, 2021, and were the subject of a separate search warrant obtained in June 2021. *See* (Def't Exhibit 6 at ¶ 43).

When Nimo began his employment with Parkway in December 2009, he acknowledged that he received, and read, the Parkway employee handbook. (Gov't Ex. B). The handbook in effect at that time is no longer available to the government, but the handbook effective in June 2010 stated it applied "to all employees regardless of date of hire." (Gov't Ex. C-1, 2010 Handbook). The handbook stated that Parkway "owns the right to use" "computer systems, software, PC equipment, internet access, electronic mail ("e-mail"), and voice-mail" provided by Parkway to "communicate with other employees, customers, or vendors regarding matters within an employee's assigned duties." (*Id.* at 25). The policy regulated use of such systems, and stated that Parkway reserved the right to monitor the systems, including "[a]ccessing, intercepting, reviewing, copying . . . any communications, images, or messages sent, received, or stored on the Systems[.] (*Id.* at 25–26) Parkway also could disclose any communications or messages to law enforcement. (*Id.* at 26). The policy was explicit: "There is no expectation of privacy with respect to any information on the Systems." (*Id.*) Parkway included that policy, or similar language, in employee handbooks effective in January 2012, April 2019, and September

2020—just eight months before Nimo was arrested and the Target Telephone was seized from co-defendant Bahoo (who also was a Parkway employee). (Gov't Exs. C-2 at 25–27, C-3 at 29–32, C-4 at 31– 33).

Nimo did not have the Target Telephone in his possession when he was arrested on April 30, 2021. Instead, he told agents that the phone was with one of his co-workers, Dani Namou or Bahoo. (Gov't Ex. D). Bahoo had the Target Telephone in her possession when agents approached her that morning. (Gov't Ex. E) But Bahoo lied to the agents, at first claiming she did not have the Target Telephone, and then claiming it was inside her house, even though she had it in her hand and appeared to use it while standing in front of the agents. (*Id.*) Bahoo told the agents that the Target Telephone belonged to Nimo, not the dealership, but that it was strictly a work cell phone. (*Id.*) Bahoo stated she was texting "Danny" (likely Namou) on a group text message, saying the police were at her house and asking what to do. (*Id.*) Agents also interviewed Shawn Harman, another of Nimo's co-workers, on April 30, 2021. (Gov't Ex. F) Harman stated clients called the Target Telephone and he believed that Bahoo had the telephone. (*Id.*)

A search of the Target Telephone after it was seized from Bahoo confirmed that at least Bahoo, Harman, and Namou used the phone to communicate with customers, in addition to Nimo. *See* (Gov't Exs. D-1 (Bahoo), D-2 (Bahoo and Namou), D-3 (Namou), D-4 (Bahoo and Harman), D-5 (Harman).

Nimo did not have an objectively reasonable expectation of privacy in the Target Telephone. The phone was purchased for business use by Nimo and his sales team, and paid for by Parkway. Parkway's policies governing "computer systems" put Nimo on notice that Parkway could seek access to the Target Telephone. In *United States v. Hilton*, a panel of the Sixth Circuit held that a Blackberry cell phone was a "computer" subject to search under a defendant's condition of supervised release permitting a search of any computer based upon reasonable suspicion. 625 F. App'x 754, 760 (6th Cir. 2015) (quoting *Riley v. California*, 573 U.S. 373, 393 (2014) ("The term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone.") and *United States v. Flores-Lopez,* 670 F.3d 803, 805 (7th Cir. 2012) ("a modern cell phone is a computer")). Those policies specified that Parkway's

employees have no expectation of privacy in those systems. Moreover, Nimo readily shared the phone with at least three co-workers.

## II.   Nimo is not entitled to a *Franks* hearing.

Nimo seeks a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), and argues the warrant to search the Target Telephone was invalid, based on omissions from Agent Kunnummyalil' s affidavit. But the omissions to which Nimo points are not material. And even if they were, the information remaining in the affidavit, even if I.S.'s statements were stricken, far exceeds the standard for probable cause.

"A defendant challenging the validity of a search warrant's affidavit bears a heavy burden."  *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). The Sixth Circuit has "repeatedly held that there is an even higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008) (citing cases); *see also United States v. Alford*, 717 F. App'x 567, 570 (6th Cir. 2017) ("*Franks* is generally inapplicable to such omissions, except where the affiant excluded critical information intentionally to mislead the magistrate judge.").

Nimo must make a strong preliminary showing that Agent Kunnummyalil (1) with intent to mislead (2) made a material omission in the affidavit, and (3) that the material omission is critical to the finding of probable cause. *Id.*; *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019); *United States v. Fisher*, 824 F. App'x 347, 353 (6th Cir. 2020). Negligence or innocent mistake are not sufficient. *Id.* Moreover, before determining whether omissions are material and made intentionally, the Court should determine whether there is sufficient probable cause in the affidavit if I.S.'s statements are set aside. *Id.* (citing *Franks*, 438 U.S. at 171–72); *see also United States v. Young,* 847 F.3d 328, 348–49 (6th Cir. 2017).

Probable cause requires only a showing of a fair probability that evidence of a crime will be found in the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Elmore*, 18 F.4th 193, 202 (6th Cir. 2021). It is not a "high bar, requiring "only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Tagg,* 886 F.3d 579, 585–86 (6th Cir. 2018) (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)).

There are several clearly defined ground rules for assessing

whether a search warrant is supported by probable cause. *First*, courts must consider the totality of the circumstances presented in the affidavit, and not engage in a "divide-and-conquer analysis," viewing each fact in isolation. *Wesby*, 138 S. Ct. at 588 (noting "the whole is often greater than the sum of its parts"). *Second*, reviewing courts should not take a "grudging or negative attitude" toward warrants and should judge an affidavit based on "what it does contain, not on what it lacks, or on what a critic might say should have been added." *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984); *Tagg,* 886 F.3d at 586. *Third*, magistrates may rely on "common-sense conclusions about human behavior" and draw reasonable inferences from information in the warrant application. *Gates*, 462 U.S. at 240; *Tagg*, 886 F.3d at 585. *Fourth*, the Court may not "write on a blank slate," should pay "great deference" to the magistrate judge's determination, and must leave that determination "undisturbed if there was a 'substantial basis' for the probable-cause finding." *Tagg*, 886 F.3d at 586 (citing *Gates*, 462 U.S. at 236); *Elmore*, 18 F.4th at 202–03. The affidavit here provided the magistrate judge far more than a substantial basis to find probable cause that evidence of conspiracy to fraudulently use employee

discounts would be found on the Target Telephone.

First, the affidavit established a link between Nimo, the Target Telephone, and use of the Target Telephone in relation to Nimo's work at Parkway. This included an encounter between Nimo and undercover agents in which Nimo gave the agents his Parkway business card listing the number for the Target Telephone. (Def't Ex. 1, ¶¶ 3, 11, 17).

Next, the affidavit described information received from FCA linking the fraudulent use of EPCN to transactions at Parkway for which Nimo was the salesperson. This included that Nimo was the top salesperson in the state of Michigan for EPCN sales in which the buyer claimed to be a brother-in-law or sister-in-law of the FCA employee, accounting for over 50 percent of Nimo's sales, whereas the average was only 21 percent. (Def't Exhibit 1, ¶ 5). Questionable claims of the "sibling-in-law" relationship to justify use of an EPCN included sales to Nimo's own father. (*Id.*, ¶10). FCA also provided analysis of 268 EPCN that FCA employees had reported as used improperly, each of which had been used in connection with sales by Nimo during the period from February to June 2018. (*Id.*, ¶ 9). The affidavit also described interviews by the agent with FCA employees who indicated their EPCN

were wrongfully used, many of them at Parkway. (*Id.*, ¶¶ 7–8).

Next, Agent Kunnummyalil described, and provided screen captures from, two Facebook user groups in which users discussed buying and selling FCA employee discounts. The agent repeatedly pointed out that telephone records showed at least nine of those users were in contact with the Target Telephone. (Def't Ex. 1, ¶¶ 12–15, 27– 41). For example, the affidavit included a screenshot of Facebook group user TB soliciting other users to "message" TB if they needed a Chrysler employee number, and phone records showed that TB and the Target Telephone were in contact a number of times between February 2019 and March 31, 2021—including two text messages sent from the Target Telephone. (*Id.*, ¶ 28). The agent also provided Facebook posts by users DY and BJ showing user DY offering to sell a Chrysler discount for $600, and user BJ offering to sell for $525. (*Id.*, ¶¶ 30, 32, 33). There at least 20 contacts between DY's telephone and the Target Telephone between March 2019 and March 2021, and at least 25 contacts between BJ's telephone and the Target Telephone between March 2019 and September 2020. (*Id.*, ¶¶ 31, 34). The contacts between Facebook users who offered FCA discounts for sale, or were seeking discounts, and the

Target Telephone outlined in Agent Kunnummyalil's affidavit are

summarized below:

| Affidavit Paragraph | Facebook User | Offer price | Number of contacts with Target Telephone | Date range | Text messages |
|---|---|---|---|---|---|
| 27 | TB | unknown | "a number of occasions" | 2/26/2019 to 3/31/2021 | 2 |
| 28–29 | BK | 500 | 7 | 6/12/2019 to 6/14//2019 | |
| 30–32 | DY | 600 | 20 | 2/8/2019 to 3/10/2021 | |
| 30, 33 | BJ | 525 | 25 | 3/13/2019 to 9/2/2020 | |
| 33 | JM | unknown | 6 | 10/7/2010 to 3/12/2021 | |
| 36 | NM | Looking to obtain "EP" 8/8-9/2019 | 4 (also repeat customer of Nimo) | 8/15/19 (2x), 2/11/21, 3/12/21 | |
| 37 | VA | 700 | 25 | 1/11/2019 to 10/12/2019 | 1 |
| 38, 39 | DB | unknown; "Chrysler discounts available" | 5 | 5/20–29/2020 | |
| 38, 41 | RS | unknown; response to KS seeking Chrysler EP plan | unknown | 3/11/2019–1/14/2021 | |
| 38, 40 | SZ | 600 | 2 | 3/8–9/2019 | |

Some of the Facebook group users specifically recommended seeing

"Apollo." One user said that "everyone in here uses him," and another said that Apollo will "give the best deal" but "you have to have a plan it'll cost you about 245[.]" (*Id.*, ¶ 14).

Agent Kunnummyalil's affidavit provided additional reasons to believe that FCA employee discounts were fraudulently used in Nimo's sales, and that the Target Telephone would contain evidence of such fraud. A manager at another dealership noted Nimo's unusually high volume of sales, and reported that "C.D." approached one of the manager's sales associates, offered to sell her FCA EPCN, and stated he sells to Nimo and other top-selling salespeople. (Def't' Ex. 1, ¶ 19). The manager's attorney followed-up with additional information that "S.Y." also approached a salesperson at the dealership and offered to sell her EPCN. The attorney provided S.Y.'s telephone number. That number was found in records for one of the Facebook groups, and was in contact with the Target Telephone repeatedly between March 2019 and August 2020—including a text message on December 5, 2019. (*Id.*, ¶¶ 20–22).

The affidavit also described contact undercover agents had with Nimo on October 8, 2019. (Def't Ex. 1, ¶¶ 16–17). When one of the agents asked if Nimo could provide an EPCN, Nimo stated that "it used

to be like that," but he could not "get no more of those numbers. That's

the problem." Nimo stated he could not get the agents an EPCN, but he

knew the going price for them ($700—the amount VA, who was in

contact with the Target Telephone as late as October 12, 2019, was

demanding on Facebook).

Last, Agent Kunnummyalil described how, in his training and

experience, conspirators often use cell phones to communicate with each

other through voice, text messaging, and social media. (Def't Ex. 1, ¶¶

43–44). He also described how evidence of such communications can be

retained on devices for years, and transferred to new devices. (*Id.* ¶¶ 45,

53).

The information in Agent Kunnummyalil's affidavit linking

Nimo's sales activity to the Target Telephone, linking Nimo's sales to

the fraudulent use of EPCN, and linking people who appeared to be

selling and buying EPCN to contacts with the Target Telephone

established a fair probability that evidence of a crime would be found on

the phone. (Def't Ex. 1, ¶ 54). There was probable cause without I.S.'s

information, and "it is not a close call." *United States v. Christian*, 925

F.3d 305, 311 (6th Cir. 2019).

In addition to failing to show that the I.S.'s statements were critical to finding probable cause, Nimo has failed to show either that Agent Kunnummyalil intentionally omitted statements by D.H. and C.W. with intent to mislead, or that those statements would have neutralized I.S.'s credibility. When interviewed by Agent Kunnummyalil in July 2020, I.S. stated that he purchased vehicles from Nimo for himself and D.H. in December 2018, and fraudulently used the discount for a retired FCA employee, C.W., with information C.W. gave him including C.W.'s employee number, date of birth, and end date of employment. (Def't Ex. 1, ¶ 25). I.S. stated that Nimo first offered to sell I.S. a discount for $600, and, after I.S. succeeded in getting C.W.'s discount instead, assisted I.S. in assigning himself as C.W.'s son-in-law. (*Id.* ¶ 25(c)–(e)). When I.S. asked Nimo if there could be legal issues for misusing EPCN, Nimo assured him that FCA does not review "in-law" relationships with EPCN purchases. (*Id.* ¶ 25(f)).

To attempt to meet his very high bar to justify a *Franks* hearing, Nimo points to statements by D.H. and C.W. that were not included in in Agent Kunnummyalil's affidavit. First, Nimo complains that the affidavit did not include that C.W. told the agent that he looked at a

photograph of I.S. and stated he does not conduct business with "foreigners." Nimo also complains that the affidavit did not include information from FCA that to obtain a retired employee's EPCN required the retiree's employee ID number, date of birth, employment end date, and last four digits of their social security number. But Agent Kunnummyalil made the contradiction between I.S. and C.W. known to the magistrate: he informed the magistrate that C.W. denied giving I.S. *any* information. (Def't Ex. 1, ¶ 24). Moreover, C.W. corroborated I.S.'s statement that he had to log on to FCA's portal to obtain an EPCN, because C.W. advised him that he did not know how to do that. (*Id.* ¶ 24, 25(d)). I.S. also provided Agent Kunnummyalil a copy of the email FCA sent with the EPCN to his and C.W.'s email addresses, and provided C.W.'s FCA information that was stored on I.S.'s mobile phone, further corroborating I.S.'s account of events. (*Id.* ¶ 25(d)).

Nimo also points to the fact that D.H. contradicted I.S.'s statement that Nimo offered to sell I.S. an employee discount. But the affidavit also did not include information that undermines D.H.'s credibility, including that D.H. admitting knowingly participating in the fraudulent use of an employee discount to obtain a vehicle, and that

D.H. appeared to be fraudulently using a fake vehicle placard designating him as a DHS "essential worker" during the COVID-19 pandemic. (Def't Exhibit 3).

Even if Agent Kunnummyalil had included D.H.'s statement contradicting I.S., and C.W.'s xenophobic comment, they would not have significantly undermined the information I.S. provided, nor negated a finding of probable cause. Omission of inconsistent statements, or bad character of an informant or witness, rarely justifies a *Franks* hearing. *See United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013) (omission of self-contradictions by victims and inconsistencies among victims did not require a *Franks* hearing); *United States v. Trujillo*, 376 F.3d 593, 603–04 (6th Cir. 2004) (omission of prior inconsistent statements of informants did not require a *Franks* hearing); *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990) (omission of information calling into question veracity of principal informant). Nimo's reliance on *United States v. West*, 520 F.3d 604 (6th Cir. 2008), is misplaced. In *West*, the affiant omitted from his affidavit his failed attempts to corroborate an incarcerated informant's report that West had confessed to murder. *Id.*, 520 F.3d at 608. Here, Agent Kunnummyalil outlined significant

corroboration of I.S.'s information, such as (1) information from FCA
(Def't Ex. 1, ¶ 23), (2) C.W.'s acknowledgment that he permitted an
unknown person to use his employee discount, and statement that he
was unfamiliar with how to use the employee portal (¶¶ 24, 25(d)), (3)
email and C.W.'s information received from I.S. (¶ 25(d), and (4) phone
records showing contact between I.S.'s telephone on the first date an
EPCN was generated for C.W. (December 20, 2018) and approximately
one-month after a second EPCN for C.W. was applied to lease a vehicle
for I.S. and D.H. through Nimo. (¶¶ 25(a)–(c), 26).

As discussed above, I.S.'s information, though additive, was not
critical to the probable cause finding. But even if it were, the
statements by D.H. and C.W. were of questionable credibility and
materiality, and Nimo has not shown that Agent Kunnummyalil did not
include them in his affidavit with the intent to mislead the magistrate.

## III. The search warrant appropriately authorized a search for text messages.

Nimo's argument that the affidavit did not support probable cause
to search for text messages is off base too. To begin with, Nimo's
"framing sets the probable cause bar too high." *Elmore*, 18 F.4th at 203.
Moreover, the Sixth Circuit has noted that "the federal courts have

rejected most particularity challenges to warrants authorizing the seizure and search of entire personal or business computers." *Richards*, 659 F.3d at 539. The court held: "[S]o long as the computer search is limited to a search for evidence explicitly authorized in the warrant, it is reasonable for the executing officers to open the various types of files located in the computer's hard drive in order to determine whether they contain such evidence." *Id.*, 659 F.3d at 540. Accordingly, "a warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime." *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018); *see also United States v. Bass,* 785 F.3d 1043, 1049–50 (6th Cir. 2015) (broad scope of warrant to search for evidence of wire fraud, credit fraud, and identity theft was reasonable); *United States v. Evers*, 669 F.3d 645, 652 (6th Cir. 2012) ("[E]ven evidence not described in a search warrant may be seized if it is reasonably related to the offense which formed the basis for the search warrant."). The search warrant authorized a search for "all records [on the Target Telephone] that relate to" wire fraud and conspiracy to commit wire fraud. (Def't Ex. 1, Attachment B). That language served as a "global modifier" limiting the

scope of the search. *Castro*, 881 F.3d at 965.

Moreover, the warrant authorized agents to search for "text messages . . . relating to communications between individuals that involve the unlawful sale, purchase, or transfer of an FCA EPCN" and "electronic messages . . . relating to membership in online groups . . . that provide or make accessible FCA EPCN to members." (Def't Ex. 1, Att. B, ¶ 1(d), (e)). As shown above, the affidavit provided abundant evidence that people selling, and buying, EPCN (including Facebook group users, and S.Y.) were in contact with the Target Telephone, including at least four text messages. (Def't Ex. 1, ¶¶ 20–22, 27–41).

The warrant also specifically authorized a search for "user attribution" evidence showing who used or owned the Target Telephone at the time of the events in the affidavit, including text messages. (Def't Ex. 1, Att. B, ¶ 1(g)).  Searches for such evidence are commonly, and reasonably, authorized when it is important (as here) to establish who used a particular place or device and when. *See, e.g., United States v. Chandler*, 571 F.Supp.3d 836, 840 (E.D. Mich. 2021);  *United States v. Gholston*, 993 F. Supp. 2d 704, 708 n.2 (E.D. Mich. 2014). Agent Kunnummyalil explained why such user attribution evidence, and

contextual evidence, is important and why it was reasonable to believe it would be found on the Target Telephone. (Def't Ex. 1, ¶¶ 47(b), 49, 53). Indeed, as Government Exhibits G-1 to G-5 show, Nimo and at least three of his co-workers used the Target Telephone.

## IV.  Nimo may not challenge the other search warrants.

Nimo also seeks to suppress evidence obtained pursuant to four other search warrants attached as exhibits to his motion: for an Apple laptop computer and two iPads (Exhibit 6), for defendant Bahoo's personal mobile phone (Exhibit 7), for Bahoo's residence (Exhibit 8), and for Bahoo's personal iCloud account (Exhibit 9). Nimo had no reasonable expectation of privacy in any of those devices, places, or accounts.

Nimo has not claimed that he had an expectation of privacy in Bahoo's personal phone, residence, or iCloud account, and no reason he could have such an expectation is readily apparent. As for the laptop and iPad tablets, any claim Nimo might make that he had a reasonable expectation of privacy fails for the same reason as the Target Telephone: they were work devices, paid for by Parkway, and subject to the Parkway policy governing computer systems. *See* (Gov't Exs. A, B,

C) Moreover, when it terminated Nimo's employment following his arrest on April 30, 2021, Parkway requested that he return any property of Parkway. (Govt' Ex. H) Nimo did not attempt to retrieve the laptop and iPads. (Def't Ex. 6, ¶¶ 42–43).

## V.    Good faith exception

Even if the Court were to find that the warrant to search the Target Telephone was not supported by probable cause, evidence from the search should not be excluded because Agent Kunnummyalil relied on the warrant in good faith.

The Supreme Court has emphasized that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011). Suppressing evidence is a "last resort," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), justified only where "the deterrence benefits of suppression . . . outweigh its heavy costs," *Davis*, 564 U.S. at 237. Suppression is only called for "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights," and not when they "act with an objectively reasonable good faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence."

*Id.* at 238. Because of the Fourth Amendment's "strong preference for warrants," the classic example of good faith is when police act "in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 914, 922 (1984). When officers have a good faith reason to believe a warrant is valid—*i.e.*, "no reason to suspect the warrant was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"—the good faith exception applies, and the exclusionary rule cannot "pay its way." *Davis*, 564 U.S. at 238–39; *United States v. Kinison,* 710 F.3d 678, 685–86 (6th Cir. 2013). The "so lacking in indicia" test for the good faith exception is less demanding than the "substantial basis" test required for a sufficient affidavit. *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004). The question is whether the officers "'reasonably believed that the warrant was properly issued, *not* whether probable cause existed in fact.'" *Kinison*, 710 F.3d at 685 (quoting *United States v. Laughton*, 409 F.3d 744, 752 (6th Cir. 2005)). As discussed above, Agent Kunnummyalil's affidavit provided far more than probable cause, much less a substantial basis to find probable cause, even without the information provided by I.S. It

was not "so lacking in indicia" that any reasonable officer would suspect it was defective.

## Conclusion

For the reasons discussed above, the Court should deny defendant Nimo's motion to suppress evidence.

Respectfully submitted,

DAWN N. ISON
Acting United States Attorney

*s/ Mark Chasteen*
Mark Chasteen
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
markchasteen@usdoj.gov
313-226-9555

October 11, 2022

United States District Court
Eastern District of Michigan
Southern Division

United States of America,

      Plaintiff,

                   No. 22-cr-20272

v.

                   Hon. Bernard A. Friedman

D-1 Apollon Nimo,
D-2 Farrah Bahoo,

      Defendants.

---

## Index of Exhibits

---

| Exhibit | Description (To Be Filed Under Seal) |
|---------|-------------------------------------|
| A | device reimbursement records |
| B | Nimo acknowledgment of employee handbook |
| C | Parkway employee handbooks (excerpts) |
| D | Nimo report of interview |
| E | Bahoo report of interview |
| F | Harman report of interview |
| G | text messages |
| H | Nimo termination letter |

## Certificate of Service

I certify that on October 11, 2022, I filed this response via the Electronic Case Filing system, which will send notice automatically to all counsel of record, including:

Patrick J. Hurford
patrick@hurford.law

Steven E. Sharg
scharg1924@gmail.com

/s/ *Mark Chasteen*
Assistant United States Attorney